# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KEISHA BARNWELL, | : | |
| PETITIONER, | : | 2010 JUL -1  A  9: 42 |
| v. | : | Civil No. 3:10-cv-563(JBA) |
| | : | |
| | : | |
| MAUREEN BAIRD AND | : | |
| AND HARLEY LAPPIN | : | |
| | : | |
| RESPONDENTS. | : | June 30, 2010 |

## RESPONDENTS' RESPONSE TO PETITIONER'S WRIT OF HABEAS CORPUS

Respondents, Maureen Baird and Harley Lappin ("Respondents") by and through undersigned counsel, respond to Petitioner's, Keisha Barnwell ("Petitioner"), habeas corpus petition, filed pursuant to 28 U.S.C. § 2241. *See* Habeas Corpus Petition, dated April 13, 2010 ("Petition"). Petitioner demands that the Bureau of Prisons ("BOP" or "Bureau") re-consider her for a twelve month transfer to a Community Corrections Center ("CCC" or "RRC"), under Second Chance Act of 2007, Pub. Law. 110-199, 122 Stat. 657 (April 9, 2008) ("Second Chance Act").[1] *See* Application for A Writ Of Habeas Corpus Memorandum ("Petition Brf.") at 1–3.

Petitioner claims that the BOP did not properly consider her request for a twelve month placement, because the BOP's current RRC regulations and internal guidance violate the Second Chance Act and the Administrative Procedures Act ("APA") 5 U.S.C. § 706. Respondents respectfully submit that Petitioner's prayer for habeas relief must be denied because (1) BOP's

---

[1]     The BOP now refers to Community Corrections Centers ("CCC"), as Residential Reentry Centers ("RRC").

current RRC regulations are valid, (2) BOP's policy statements are valid, and (3) the Second

Chance Act gives BOP the sole and exclusive discretion to determine whether and for how long

to place an inmate in a RRC or on home confinement.

**PROCEDURAL AND FACTUAL BACKGROUND**

**I.   THE SECOND CHANCE ACT**

### A.   Statutory Framework

On April 9, 2008, Congress enacted the Second Chance Act.  The Second Chance Act,

alters the amount of time that the BOP may, in its discretion, assign inmates to RRCs for

"pre-release" or "end of sentence" placement under 18 U.S.C. § 3624(c), increasing the possible

duration of such assignments from a maximum of six months to up to twelve months. *See*

Second Chance Act, § 251(a)(1) (codified at 18 U.S.C. § 3624(c)(1)).  The Second Chance Act

further provides factors to be considered by the BOP in making such assignments and provides

that consideration for such placements must be conducted on an individual basis. 18 U.S.C. §

3624(c)(6).  Subsection 3624(c)(6) requires that the BOP consider a list of factors contained in

18 U.S.C. § 3621(b):  (1) the resources of the facility contemplated; (2) the nature and

circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement

by the court that imposed the sentence . . . and (5) any pertinent policy statement issued by the

Sentencing Commission.  It further requires that such consideration be undertaken on an

individual basis and that placements be "of sufficient duration to provide the greatest likelihood

of successful reintegration into the community."

The Second Chance Act makes unmistakably clear that inmates are not entitled to any

RRC placement at all. *See* 18 U.S.C. § 3621(b); 18 U.S.C. § 3624(c)(4) ("Nothing in this

2

subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621.")  Indeed, the BOP is only required to evaluate placement. Specifically, § 3624(c) orders the BOP to consider an inmate's need to transition from confinement back into the community.  Section 3624(c), as amended by the Second Chance Act, provides the following:

> The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

18 U.S.C. § 3624(c)(1).

The statute imposes no requirement that a pre-release placement ever be in a RRC, providing only that such placements "may" include a RRC.  The only mandatory duty is that the Bureau "shall" consider a placement for the inmate that will assist her transition to the community.  18 U.S.C. § 3624(c)(1).  There is no entitlement to RRC placement as a result of such consideration.  That is to say, Congress has made unmistakably clear that the Bureau has the authority, but not the duty, to make RCC placements. *See Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion. That connotation is especially apt where . . . 'may' is used in contraposition to the word 'shall.'"); and *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (the Bureau had "authority, but not the duty" based on Congress's decision to use the permissive "may" and noting that "Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section.")  Thus, under the Second Chance Act, the BOP must undertake consideration of the

3

inmate's "end of sentence" placement considering the factors provided by Congress, but as part of that consideration, it "may," or may not, choose to place an inmate in a RCC. Where, as here, Congress has chosen to use the term "may" in the very same subsection in which it has identified non-discretionary duties by use of the term "shall," it is clear that Congress intended to confer discretion by its use of the term "may." *See Jama; Lopez, supra.*

Finally, the legislative history makes clear Congress' intent that the BOP have sole and exclusive discretion to make such placements. In adopting the relevant provisions, Congress stated:

> This section clarifies existing procedures, and relaxes the maximum period for which an offender may be released into a community correctional facility, prior to release to the community, by affording the Director of the Bureau of Prisons the discretion to place an offender in a halfway house for up to 12 months prior to the offender's release date.

> This section also amends section 3561 of title 18, United States Code, to prohibit Federal judges from sentencing defendants to a community correction facility. The section reiterates that the Bureau of Prisons has sole and exclusive authority to designate the facility where prisoners will serve a sentence and to order a transfer from one facility to another. In addition, the Bureau of Prisons has the sole and exclusive authority to determine when and if a prisoner should be transferred or designated to a community correctional facility, which typically occurs near the end of the prisoner's sentence.

H. Rep. No. 110-140, *20, reprinted in 2008 U.S.C.C.A.N. 24, *38 (May 9, 2007) (addressing the relevant amendments in Section 251 of the Second Chance Act) (emphasis added).

Nor does the statute require that "end of sentence" placements be made for any particular time period. It provides only that the placement shall be for a "a portion" of the last twelve months. 18 U.S.C. § 3624(c)(1). This language clearly confers discretion upon the Bureau to determine what "portion" is appropriate. Had Congress wished otherwise, it could have

specified that the placement was mandatory for the entire twelve month period. Congress' failure to do so provides further support for the argument that Congress intended to vest "sole and exclusive" discretion to make such placements with the BOP. *See* H. Rep. 110-140, * 20, *supra*. In these circumstances, to read the statute as imposing a duty to provide every inmate a twelve month placement would render the inclusion of the term, "a portion," to be mere surplusage. Further, such a reading would run expressly counter to Congress' stated intent to confer upon the BOP the "sole and exclusive" discretion to make such placements. *See* H. Rep. 110-140, *20, *supra*.

In sum, the Bureau is now required to individually consider each inmate for an end of sentence placement that will facilitate successful re-integration into the community utilizing the factors espoused by Congress and has the authority to make "end of sentence" placements of up to twelve months duration. There is no requirement that all placements be for twelve months, nor is there any requirement that such placements ever be in a RRC or home confinement. Whether, and when, to make such placements is within the "sole and exclusive" discretion of the BOP.

## 1.   April 14 Memorandum

On April 14, 2008, the BOP internally circulated a guidance memorandum instructing BOP staff on how to implement the Second Chance Act in the period before the BOP issued its new regulations. *See* Memorandum For Chief Executive Officers, Subject: Pre-Release Residential Re-entry Center Placements Following the Second Chance Act of 2007, dated April 14, 2008, ("April Memo"), attached as Exhibit C to Declaration of Louise Tolworthy ("Tolworthy Decl."), dated June 9, 2010, attached hereto as Exhibit 1 ("Ex.1"). The memo

instructs staff that the BOP is now authorized under § 3624(c) to make pre-release halfway house placements for any inmate for up twelve months.  It directs that § 3624(c) reviews should be conducted 17-19 months before each inmate's projected release date and that placement decisions should be made in accordance with Program Statement 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure*, 179-208, as modified by the April 14 memo.[2]

The April 14 memo states unequivocally that each inmate must receive an individualized § 3624(c) review and that staff must consider all five of the § 3621(b) factors, as well as the other factors listed in Program Statement 7310.04, including the inmate's need for services, issues of public safety, and the BOP's inmate population management responsibilities. *Id.* at 2-4.  The memo states, in relevant part:

> "[T]he Act requires staff to ensure that each pre-release RRC placement decision is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.' This means BOP staff must approach every individual inmate's assessment with the understanding that he/she is now <u>eligible</u> for a maximum of 12 months pre-release RRC placement."

*Id.* at p. 4 (emphasis in original; internal citations omitted).  Within the 12-month ceiling set by the statute, the BOP's April 14 memo informs staff that: "Bureau experience reflects inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less." *Id.*

---

[2]     The April 14 memo modified the Program Statement in the following ways: (1) Section 5 of the Program Statement quoting now-amended statutory text is to be disregarded and staff is to refer to the current statutory provisions; (2) review of inmate's pre-release placement must be conducted 17-19 months before the inmate's projected release date; (3) pre-release placement decisions must be made on a individual basis for each inmate, staff much consider the five § 3621(b) factors in making its decisions under § 3624(c), and "Bureau staff must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum of 12 months pre-release RRC placement;" and (4) the warden must obtain written approval from the Regional Director for RRC placements greater than six months. *Id.* at 1-3.

It then instructs staff on the process for recommending an inmate for RRC placement for more than six months. *Id.*

### 2.    2008 Interim Rule

The Second Chance Act directed the BOP to promulgate regulations that "shall ensure that placement in a community correctional facility by the Bureau of Prisons is – (A) conducted in a manner consistent with section 3621(b) of this title [18 USCS § 3621(b)]; (B) determined on an individual basis; and (C) of sufficient duration to provide the greatest likelihood of successful reintegration into the community." The regulations were to be promulgated within 90 days of the Act's April 9, 2008, enactment. The BOP promulgated its interim regulations ( "2008 Interim Rule") on October 21, 2008, which "revises current regulations on pre-release community confinement to conform with the requirements of the Second Chance Act of 2007." 28 C.F.R. § 570.20-.22 (2008), attached hereto as Exhibit 2.  The regulations "provide the procedures of the Bureau of Prisons (Bureau) for designating inmates to pre-release community confinement or home detention." *Id.* at § 570.20.  With regard to halfway house placement, the regulations provide that: "Inmates may be designated to community confinement as a condition of pre-release custody and programming during the final months of the inmate's term of imprisonment, not to exceed twelve months." *Id.* at § 570.21.  They further direct that inmates will be considered for halfway house placement on an individual basis pursuant to 18 U.S.C. § 3621(b) and "for a sufficient duration to provide the greatest likelihood of successful reintegration into the community . . . ." *Id.* at § 570.22.[3]  In short, the interim regulation is

---

[3]      The 2008 Interim Rule states in relevant part:
"[W]e therefore make the following changes to conform
to the specific language in section 251(a) of the Second Chance Act:

interpretative in nature, tracking the language of the Second Chance Act.

### 3.  November 14 Memo

The BOP issued a second internal memorandum to staff on November 14, 2008, to provide guidance on how to process inmate requests for a transfer to a halfway house when the inmate has more than twelve months remaining on his sentence. *See* Memorandum For Chief Executive Officers, Subject: Inmate Requests for Transfer to Residential Reentry Centers, dated

---

Paragraph (a) of the revised Sec. 570.21 states that inmates may be designated to community confinement as a condition of pre-release custody and programming during the final months of the inmate's term of imprisonment, not to exceed twelve months . . . .

Section 570.22 Designation
In this section, we inform inmates that they will be considered for pre-release community confinement in a manner consistent with 18 U.S.C. 3621(b), determined on an individual basis, and of duration sufficient to optimize the likelihood of successful reintegration into the community. This section reflects the requirements of the Second Chance Act regarding the promulgation of these regulations. Section 251(a)(6) of the Second Chance Act requires the Bureau to implement regulations that ensure that placements in community confinement as a condition of pre-release custody are:
> Conducted in a manner consistent with 18 U.S.C. 3621(b);
> Determined on an individual basis; and
> Long enough "to provide the greatest likelihood of successful reintegration into the community."
Section 570.22 reflects the three factors listed above.
With regard to the requirement that determinations regarding pre-release community confinement are "conducted in a manner consistent with 18 U.S.C. 3621(b), "the Bureau will ensure that the following factors listed in section 3621(b) will be considered in making such determinations:
> The resources of the facility contemplated;
> The nature and circumstances of the offense;
> The history and characteristics of the prisoner;
Any statement by the sentencing court concerning the purpose for which the sentence was imposed or recommending a specific type of institution; and
Any pertinent policy statements issued by the United States Sentencing Commission.

November 14, 2008, ("November Memo"), attached as Exhibit 3. The November 14 memo again instructs staff that transfer decisions must be made on an individual basis with consideration of the five § 3621(b) factors and that inmates are eligible for RRC placements at any time during their sentence. *Id.* at 2-3. The November 14 memo reiterates the purpose of halfway houses: "to assure accountability, provide program opportunities in employment counseling and placement, substance abuse, and aid inmates in acquiring daily life skills so as to successfully reintegrate into the community at large," and states that "[a]n RRC placement beyond six months should only occur when there are unusual or extraordinary circumstances justifying such placement, and the Regional Director concurs." *Id.* at 3.

## II.   PETITIONER'S SENTENCE AND RRC PLACEMENT

Petitioner is a federal inmate confined to Federal Correctional Institution at Danbury, Connecticut ("FCI Danbury"). *See* Tolworthy Decl. at ¶ 3. Petitioner is currently serving a thirty-sixy (36) month sentence for Conspiracy to Commit Armed Bank Robbery and Aiding and Abetting Armed Bank Robbery. *Id.* Petitioner entered the BOP's custody on or about August 12, 2008. *Id.* Petitioner is set to be released from the BOP custody on January 5, 2011, via reaching her Good Conduct Time release date. *Id.*

On or about May 19, 2009, Petitioner was considered by her Unit Team for pre-release placement to a RRC under the Second Chance Act. *See* Tolworthy Decl. at ¶ 5-6. At the time of Petitioner's RRC review in May of 2009, the BOP considered her individual factors under § 3621. Petitioner's Unit Team determined that she would be recommended for a RRC placement of 120 to 150 days. *See id.* The BOP's determination was based on an assessment of Petitioner's individual circumstances, including the resources at the facility, the nature of Petitioner's

offense, and the history and characteristics of Petitioner. *See* Residential Re-Entry Center Consideration Form, dated May 19, 2009, attached as Exhibit D to Tolworthy Decl. The BOP determined that a placement of 120 to 150 day (four to five months) would be of sufficient duration to provide the greatest likelihood of successful reintegration into the community. *See* Tolworthy Decl. at ¶ 6.

Specifically, the Unit Team made the following factual findings: Petitioner participated in a pre-meditated armed bank robbery, she has a lengthy work history, she is well educated, she is single with no dependants, she has resided with her mother and plans to reside with her mother upon release, and she has strong social support from her community of friends and family. *Id.* at ¶ 6.[4] The Unit team also considered the fact that Petitioner has not been removed from the community for an extended period of time, which would require a lengthy pre-release placement to re-establish community ties. *Id.* at ¶ 6. In fact, Petitioner was sentenced to 36 months in prison, and voluntarily surrendered to FCI Danbury on August 12, 2008. *Id.* at ¶ 6. With a 4 to 6 month RRC placement, she would only be at FCI Danbury for a little over two years. *Id.* at ¶ 6.

On or about April 19, 2010, Warden Maureen Baird ("Baird") signed an Institutional Referral for CCC Placement for Petitioner, which recommended Petitioner for a 150 to 180 day

---

[4]     Evidence that Petitioner has support from her family and friends is found in Petitioner's BOP Trust Fund Account, which reveals that while Petitioner maintains an average daily balance of approximately $25.94, she has had National 6 Month Deposits of $1,530.40, with National 6 Month Withdrawals of $1,572.16. *See* Tolworthy Decl. at ¶ 9. Additionally, even though Petitioner claims that she needs the maximum twelve month pre-release placement in an RRC to save money to pay restitution for her underlying offense, and other bills, Petitioner has made no effort to save money to assist her toward these goals. For example, her commissary purchases alone from January 1, 2010 through June 8, 2010 total approximately $1,100.00. *Id.* Additionally, she is making only $25.00 monthly payments towards her financial responsibilities. *Id.* A true and accurate copy of Petitioner's Trust Fund Account Inmate Inquiry is attached as Exhibit G to Tolworthy Decl.

(five to six months) placement, and then submitted the form to the Community Corrections Manager ("CCM") for review and consideration of her RRC placement. *Id.* As a result, Petitioner has been approved for a RRC pre-release placement to the Luzerne Community Corrections Center in Philadelphia, Pennsylvania for July 13, 2010. *Id.* This constitutes a 177 day placement on her 36 month sentence. *Id.* at 7.[5]

## ANALYSIS

### I.   BOP'S INTERIM REGULATION IS VALID

Petitioner challenges the BOP's 2008 Interim Rule implementing the Second Chance Act. Petitioner first claims that the BOP's 2008 Interim Rule violated the APA, because BOP issued the 2008 Interim Rule without notice and comment, and has failed to establish "good cause." Second, Petitioner claims that the BOP's 2008 Interim Rule is substantively inadequate because it fails to provide guidance. Petitioner argues that this Court should issue a writ of mandamus to force the BOP to issue regulations. Petitioner's claims lack merit.

### A.   The 2008 Interim Rule Is Interpretative And Exempt From Notice And Comment, Alternatively The Good Cause Exception Applies

Petitioner argues that the 2008 Interim Rule violated the APA, because it was promulgated without notice and comment. Section 553 of the APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register . . .[but] this subsection does not apply - - (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice ." Therefore, the notice and comment provision of § 553, do not apply to interpretative rules, but rather to legislative or substantive rules. *Id.* The APA itself

---

[5]     Petitioner has exhausted her administrative remedies. *See* Declaration of Cheryl Magnusson, dated June 9, 2010, attached as Exhibit 4.

does not explain the distinction between a substantive rule and an interpretative rule or policy statement. The statute defines "rule" as encompassing all three types: "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure or practice requirements of an agency . . . ." 5 U.S.C. § 551(4).

The Supreme Court identified the touchstone characteristic of substantive rules to be that they "affect[] individual rights and obligations." *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 (1979). It is only substantive rules that "have the force and effect of law." *Id.* The Attorney General's Manual on the Administrative Procedure Act, upon which the Supreme Court has relied, states "[l]egislative, or substantive, regulations are 'issued by an agency pursuant to statutory authority and . . . implement the statute, . . . .Statements of general policy and interpretations need be published only if they are formulated and adopted by the agency for the guidance of the public." Attorney General's Manual on the Administrative Procedure Act at 30 n.3 (1947). In contrast, general statements of policy are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Id.*

"If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." *La Casa Del Convaleciente v. Sullivan,* 965 F.2d 1175, 1178 (1st Cir. 1992). However, if a statement is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," then it is interpretive. *Shalala v. Guernsey Mem. Hosp.,* 514 U.S. 87, 88 (1995) (Agency issued interpretative guidelines and was charged with administration of statute.); *see also,* Attorney

General's Manual on the Administrative Procedure Act (1947).

Legislative or substantive rules "create new law, rights, or duties, in what amounts to a legislative act." *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993)("The central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights or duties.") Interpretative rules, on the other hand, "clarify an existing statute or regulation." *Id.* The distinction between legislative and interpretative rules "turn on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute or rule." *Paralyzed Vets. of America v. D.C. Arena L.P.*, 117 F.3d 579, 588 (D.C.Cir. 1997), *cert.denied, Pollin v. Paralyzed Vet. of America*, 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998). An interpretive rule is an agency's "intended course of action, its tentative view of the meaning of a particular statutory scheme, or internal-housekeeping measures organizing agency activities." *Perales v. Sullivan*, 948 F.2d 1348 (2d Cir. 1991)(internal quotations omitted.)

Where an agency goes beyond the text of the statute in promulgating a regulation, the regulation is more likely to be deemed legislative. *Id.* at 589. On the other hand, a regulation is likely to be deemed interpretative where the a statutory scheme imposed the duty on the agency and the regulation merely published the agency's standards for adjudication. *Id.*; *Appalachian States Low-Level Radioactive Waste Com'n v. O'Leary*, 93 F.3d 103, 113 (3d Cir. 1996)(*citing American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1108-09 (D.C.Cir.1993). In short, interpretative rules are "issued by an agency to advise the public of the agency's construction of the statutes and the rule which it administers." *Guernsey Mem'l Hosp.*, 514 U.S. at 99. (*quoting Chrysler Corp. v. Brown*, 441 U.S. 281, 302, n. 31 (1979).

13

Furthermore, where as here, a regulation merely reasserts the language of the newly enacted statutory provisions, it is the statute, not the regulation that has the force of law. This is because it was the action of Congress, and not the agency, which required the change in prior regulations. *White v. Bowen*, 636 F.Supp. 1235, 1241 (S.D.N.Y.,1986)*(citing Donovan v. Red Star Marine Servs., Inc.*, 739 F.2d 774 (2d Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1355, 84 L.Ed.2d 377 (1985) ("In drawing the line between substantive and interpretative rules, the Second Circuit no longer looks to the impact of a rule. . . but focuses instead upon the change in law effected by a rule. Only rules that do not change 'existing rights and obligations' are considered interpretative.")(citation and internal quotation marks omitted.) [6]

The 2008 Interim Rule does not create a duty not already created by the statutory scheme. As Petitioner concedes, the 2008 Interim Rule "adheres closely" to the statutory language,

---

[6]    Petitioner cites to *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478, 482 (2d Cir. 1972), for the proposition that the Second Circuit follows the "substantial impact approach." We disagree. *Lewis-Mota's* substantial impact analysis has not been good law since 1984. *See Donovan, supra.*

Petitioner also cites to a four step analysis adopted by the D.C. Circuit, in *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1112 (1993). *See* Petition Brf. p. 40. Petitioner concludes that the 2008 Interim Rule is legislative because it falls into two of the categories enumerated by the D.C. Circuit – it was published in the CFR and amended a prior legislative rule. Petitioner is wrong. A year after *American Mining*, the D. C. Circuit amended the criteria, and held that publication of a rule in the CFR does not necessarily mean that the rule is legislative. *Health Ins. Ass'n of America, Inc. v. Shalala,* 23 F.3d 412 (D.C.Cir.1994), *cert.denied,* 513 U.S. 1147, 15 S.Ct. 1095, 130 L.Ed2d 1064 (1995).

Furthermore, as discussed in detail above, it was the Second Chance Act, and not the 2008 Interim Rule that changed the BOP's previous regulations. In fact, as Petitioner notes in her brief, the regulation that preceded the 2008 Interim Rule (28 C.F.R. §570.21), which previously provided guidance on pre-release placement, was struck down by the Second Circuit in *Levine,* and four other circuits. *See* Petition Brf. at 8-9. Petitioner herself argues that the Second Chance Act ended the litigation over the previous regulation by invalidating the six month restriction asserted by the BOP in the previous regulation. *Id.* Thus, the 2008 Interim Rule did not change the law on RRC placement decisions–the Second Chance Act changed the law.

tracking it and "draw[ing] linguistically from the actual language of the statute." *Paralyzed Vets of America*, 117 F.3d at 588. Petitioner notes that the 2008 Interim Rule "did not provide any sort of benefit. . . [it]merely repeated the language of the governing statute." *See* Petition Brf. at p. 39.

Petitioner claims that the 2008 Interim Rule draws too closely from the language of the Second Chance Act, arguing that the regulation "parrots" the Second Chance Act. But by claiming the 2008 Interim Rule mirrors the statutory scheme, Petitioner tacitly acknowledges that it was the Second Chance Act, that has the force of law and imposed the duty on the agency to consider all inmates for a twelve month pre-release placement – and not the regulation. Indeed, the BOP, in promulgating the 2008 Interim Rule, merely published the agency's standards for adjudicating a statutory scheme already operative. *Metro. Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 490 (7th Cir.1992) ("legislative rules have effects completely independent of the statute."), *cert.denied*, 507 U.S. 949, 113 S.Ct. 1360, 122 L.Ed.2d. 740 (1993) (internal emphasis, quotation marks and citations omitted); *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 n. 153 (D.C.Cir.1979)("[a]n interpretative rule simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.'). *Sepulveda v. Block*, No. 84 Civ. 1448 (MJL), 1985 WL 1095, at *3-5 (S.D.NY. Apr. 26, 1985)(The challenged regulation "traces the statute. . . the change in law was effectuated by the statute, not the regulation. . . . Accordingly, we find that the regulation was exempt from the APA."), *aff'd on other grounds*, 782 F.2d 363 (2d Cir. 1986). In short, the 2008 Interim Rule is an interpretative rule, which does not have the force of law, and is not subject to notice and comment procedures.

15

### 1.   Good Cause Exception

Assuming, for the sake of argument, that this Court holds that the 2008 Interim Rule was not interpretative, the good cause exception would apply.  The APA permits an agency to promulgate regulations without advanced notice and comment, "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B), (d)(3).

The BOP explained why it expedited the regulations:

> Adopting the rule though the normal notice-and-comment procedures would not be consistent with the short statutory time-frame provided for implementing these regulatory changes.  Requiring formal notice-and-comment procedures would be contrary to the public interest in this case, particularly because the revision of these regulations will provide a greater benefit for inmates, through the possibility of a greater community confinement time-frame than that contemplated under the current regulations.  Because this change is responsive to mandates in legislation and is interpretative in nature, we find that normal notice-and-comment rulemaking is unnecessary and contrary to the public interest.

> Therefore, to best comply with Congress's mandate that the revised regulations be timely issued, we issue these changes revising subpart B of 28 CFR part 570 as an interim final rule.  We will accept comments to this interim final rule and consider and discuss comments received during the comment period in our final rule document.

> Further, we forgo the requirement under 5 U.S.C. 552(d) which provides for regulations to go into effect 30 days after the date of publication for the reasons stated above.  In particular, a delayed effective date would be inconsistent with regard to the time-frames articulated by the Second Chance Act and rapid implementation would benefit inmates.

Pre-Release Community Confinement, 73 Fed. Reg. 62440, 62442 (Oct. 21, 2008) (to be codified at 28 C.F.R. pt. 570).

The "good cause" inquiry is fact or context-specific, *Mid-Tex Electric Coop., Inc. v.*

16

*Federal Energy Regulatory Comm'n,* 822 F.2d 1123, 1132 (D.C. Cir. 1987), and while one factor alone might not establish good cause, the court should consider the totality of the circumstances. *Id.; see Sepulveda,* 782 F.2d at 366.(engaging in a fact specific inquiry).

Here, the BOP properly reasoned that prior notice and comment was unnecessary, impracticable, and contrary to the public interest.  First, the 2008 Interim Rule is not expansive, is an interim rule, and tracks the language of the authorizing statute.  Petitioner concedes this point, arguing that the rule is interim and "merely repeat[s] the language of the governing statute."  *See* Petition Mem. at 39-40.  Since the interim rule does not add to or expand the statutory language, the BOP's execution of its responsibilities would be unnecessarily impeded by time-consuming notice and comment procedures.  *See Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States,* 59 F.3d 1219, 1223-4 (Fed. Cir. 1995) (Agency reasonably concluded notice and comment was unnecessary and contrary to the public interest, where Congress directed the agency to change regulations to provide benefit to the public); *Nat'l Nutritional Foods Ass'n v. Kennedy,* 572 F.2d 377, 385 (2d Cir. 1978) (Where agency issued new standards, extending the agency's powers,  notice and comment is required and good cause exception does not apply.); *Tennessee Gas Pipeline Co. v. Federal Energy Regulatory Comm'n,* 969 F.2d 1141, 1144 (D.C. Cir. 1992) (The less expansive the interim rule, the less the need for public comment.)  Furthermore, Courts have acknowledged that a regulation that is "temporally limited in scope is a key consideration."  *Mid-Tex Electric Coop, Inc.* 822 F.2d at 1132. (Status of the Rule as an interim rule and not a final rule is significant to the good cause analysis.)

Furthermore, the BOP did not have to publish the interim rule thirty days in advance, because the public did not need time to conform to a rule that merely restates a law already in

effect. Recall that the Second Chance Act required the BOP to consider all inmates for a maximum of twelve months pre-release placement. The BOP aptly chose to first execute the statutory mandate through an interim rule, then request comments from the public. *See* Petition Brf. at 35-37.

Second, the BOP properly concluded that prior notice and comment was impracticable because Congress allowed the BOP only ninety-days to implement the Second Chance Act. Notice-and-Comment rulemaking is a time-consuming process, and the Administrative Council recommends a "minimum" of sixty days for comment alone. *Petry v. Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984). After the comment period, the agency requires additional time to consider the comments, and then more time to redraft the rule in final form, if necessary. *Id.* at 1202; *U.S. Steel Corp. v. U.S. Environmental Protection Agency,* 605 F.2d 283, 287 (7th Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980)(Agency had good cause when it faced a statutory deadline of 180 days); *Republic Steel Corp. v. Costle* 621 F.2d 797, 803-4 (6th Cir. 1980)(Noting the importance of being sensitive to statutory timetables.); *Nat'l Women, Infants & Children Grocers Ass'n v. Food & Nutrition Serv.,* 416 F. Supp. 2d 92, 106 (D.C. Cir. 2006)(Statutory deadline of eighteen months). The BOP justifiably concluded that prior notice and comment was impracticable given the ninety-day statutory deadline. In sum, the BOP had good cause to forgo notice and comment, and the thirty day time period, in its promulgation of the 2008 Interim Rule.

## **B.** **The 2008 Interim Rule Is Adequate**

A court's review of an agency's decision under the APA is deferential to the respective agency and presumes the agency action to be valid. *See Martin v. Willingham*

18

430 F.Supp.2d 82, 85-86 (D.Conn. 2006) (*citing Chevron, U.S.A., Inc.*, 467 U.S. at 865. Under *Chevron,* an agency's exercise of its delegated power receives deference from the courts. *Id.* Courts employ a two step analysis when reviewing agency decisions. *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

First, courts determine whether Congress intended to give the agency any discretion, and will ask "whether Congress has directly spoken to the precise question at issue." *Id.* If Congress has spoken on the issue, "the inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress." *Id.* "But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible." *Id.* Second, the court defers to the agency's construction so long as agency regulations are not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844; 5 U.S.C. § 706(2)(A). Courts "should not substitute their judgment for that of the agency." *Karpova*, 497 F.3d at 267.; *see also Henley v. FDA*, 77 F.3d 616, 620 (2d Cir. 1996), *aff'd*, 77 F.3d. 616 (2d Cir. 1996).

Petitioner does not allege ambiguity in the statutory language of the Second Chance Act.[7] To the contrary, she alleges that Congress' mandate was clear, and the BOP

---

[7]     Even if Petitioner claimed the statute was silent or ambiguous, the BOP's interpretation of the Second Chance Act, and its promulgation of the 2008 Interim Rule would be entitled to *Chevron* deference. *See Barnhart v. Walton,* 535 U.S. 212, 221-22 (2002)("[T]he fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise it's due. . . whether a court should give such deference depends in significant part upon

19

failed to properly promulgate regulations to implement the Act.  Congress, pursuant to §

3624(c)(6), directed the BOP to promulgate regulations that "ensure that placement in a

community correctional facility by the Bureau of Prisons is –(A) conducted in a manner

consistent with section 3621(b) of this title [18 USCS § 3621(b)]; (B) determined on an

individual basis; and (C) of sufficient duration to provide the greatest likelihood of

successful reintegration into the community."  The BOP's 2008 Interim Rule, as cited

above, meets all of these requirements.

The 2008 Interim Rule "revises current regulations on pre-release community

confinement to conform with the requirements of the Second Chance Act of 2007 . .

.provide[s] the procedures of the Bureau of Prisons (Bureau) for designating inmates to

pre-release community confinement or home detention . . . .[provides that ] [i]nmates may

be designated to community confinement as a condition of pre-release custody and

programming during the final months of the inmate's term of imprisonment, not to

exceed twelve months. . . .[and direct[s] individualized assessments and placements] for a

sufficient duration to provide the greatest likelihood of successful reintegration into the

community . . . ."  *Id.* at § 570.22.

Petitioner's argument to the contrary is confusing.  She argues, simultaneously,

two competing theories:  that the BOP "exceeded [its] authority and abused [its]

discretion" in promulgating the 2008 Interim Rule, but that the 2008 Interim Rule

"merely parrots" the Second Chance Act.  *See* Petition Brf. at 33.  Petitioner sets forth a

_____

the interpretive method used and the nature of the question at issue.")(internal citation omitted.).

checklist of items she believes the 2008 Interim Rule should contain, such as "adopt a presumption of twelve months' pre-release placement, . . . elaborate categories of prisoner[s] that would benefit from more extensive pre-release placements, . . .calculus for weighing different factors like employability, family needs, or good behavior in determining whether a placement provides the greatest likelihood of successful reintegration, elaborate how the § 3621(b) factors will be weighed." In short, Petitioner asks this Court to set aside the 2008 Interim Rule, not because the BOP exceeded its authority, but because Petitioner wants the 2008 Interim Rule to say more than it says.

This Court, however, cannot grant Petitioner the relief she seeks because courts do not "substitute their judgment for that of the agency." *Karpova*, 497 F.3d at 267. The APA does not permit a court to invalidate a regulation on the ground that it adheres too closely to the language of the statute it implements. *See e.g., Komjathy v. NTSB*, 832 F.2d 1294, 1296 (D.C.Cir. 1987), *cert.denied*, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988)("The fact that the regulation merely reiterates the statutory language precludes any serious argument that the regulation affects the agency or holders of airman certificates in such a way as to require notice and comment"). There is no authority for the position that regulations that mirror the statute they implement are "per se invalid nor that parroting alone necessarily invalidates the regulations." *La Union Del Pueblo Entero v. Federal Emergency Management Agency*, (No. 09-40948), --- F.3d ----, 2010 WL 2179804 (5th Cir. 2010).[8] Indeed, quite the opposite is true. *See Komjathy, supra.* The

---

[8]     Petitioner conflates and confuses the inquiry, citing to cases that are inapposite. First, *Watters v. Wachovia*, 550 US 1, 42 (2007), *Gonzalez v. Oregon*, 546 U.S. 243, 257 (2006), and

more the regulation conforms to the statute, the more likely it is that the regulation is

interpretative in nature. *Warshauer v. Solis,* 577 F.3d 1330, 1337-1338 (11th Cir. 2009)

(Regulation implementing statute, which drew directly from the plain language of the

statute was interpretative in nature, as it did not create any new law, right, duty, or have

any effect independent of the statute.) Thus, Petitioner's claim that the 2008 Interim Rule

violates the Second Chance Act, simply because it tracks the statutory language, lacks

---

*Parker v. Office Personnel Management,* 974 F.2d 164, 167 (Fed.Cir. 1992) do not stand for the proposition that regulations that mirror the statutory language they implement are *per se* invalid. In all of the aforementioned cases, the court was faced with a totally different set of facts. The courts were reviewing ambiguous statutes, and noted that because the regulations mirrored the statutory language, the agency's regulations were not helpful in the analysis, since the inquiry was not the meaning of the regulation, but the meaning of the statute. Here, Petitioner is challenging whether an agency can issue interpretative regulations that track the statutory language. Thus, the aforementioned cases are not applicable.

Similarly, *Massachusetts v. EPA* is equally unpersuasive. The statute under review in *Massachusetts,* related to the EPA's scope of authority to render "scientific judgment[s]" on air pollutants, and *unlike* the case at bar, the EPA's decision *not to* regulate greenhouse gas emissions. *Massachusetts v. EPA,* 549 U.S. 497 (2007) *Id.*

In fact, the only case cited by Petitioner that is applicable, has been overruled by the Fifth Circuit. *See La Union del Pueblo Entero v. Fema,* No. B:08cv487, 2009 WL 1346030, at *1, (S.D. Tex., May 13, 2009) (*vacated by La Union Del Pueblo Entero v. Federal Emergency Management Agency,* --- F.3d ----, 2010 WL 2179804 (5th Cir. 2010)(NO. 09-40948). The Fifth Circuit, in vacating the district court's ruling stated: "The cases do not, however, suggest that 'parroting' regulations are per se invalid or that parroting alone necessarily invalidates the regulations. In short, although the C.F.R. materials do not lay out the 'criteria, standards, and procedures for determining eligibility for assistance' with as much specificity as might be desired, we cannot conclude that the regulations contravene Congress's directive to issue eligibility regulations. . . . Accordingly, we conclude that FEMA has complied with the congressional directive by publishing these regulations . . . . A regulation could always be more specific, and so it will always contain some vagueness that vests on-the-ground personnel with a level of discretion. FEMA's regulations for housing repair assistance are especially vague about the meaning of "disaster-related." Indeed, they do not venture beyond the statutory language. But this vagueness does not automatically mean the regulations are invalid. Given the nature of FEMA's work and the compressed time it has to make individual determinations, the agency requires relatively wide discretion for the ground-level workers who make initial assistance decisions. In conclusion, we hold that the district court abused its discretion in issuing the preliminary injunction." *Id.*

merit. The 2008 Interim Rule is interpretative in nature, and conforms to the statute's directive.

### C.    Petitioner Is Not Entitled To A Writ of Mandamus

Petitioner's request for mandamus relief lacks legal and factual merit. The federal mandamus statute, 28 U.S.C. § 1361, grants federal courts jurisdiction to consider actions in the nature of a mandamus "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." *Id.* Mandamus is an extraordinary remedy "granted only in the exercise of sound discretion." *Miller v. French*, 530 U.S. 327, 339 (2000); *Allied Chemical Corp. v. Daiflon Inc.*, 449 U.S. 33, 34 (1980)("[M]andamus is a drastic remedy, to be invoked only in extraordinary situations."); *Pittston Coal Group v. Sebben*, 488 U.S. 105, 120 (1988) (*quoting Heckler v. Ringer*, 466 U.S. 602, 616 (1984)(Mandamus may only issue "to compel the performance of 'a clear nondiscretionary duty.'")

The three prerequisites for the issuance of a writ of mandamus are not present in this case: "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Lovallo v. Froehlke*, 468 F.2d 340, 343 (2d Cir.1972) (*citing United States ex rel. Girard Trust Co. v. Helvering*, 301 U.S. 540, 543-44,(1937), *cert. denied*, 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973).

Indeed, Petitioner cannot get past the first factor. Petitioner has no right to the relief sought because the BOP has issued regulations and guidance. Beyond Petitioner's

arguments expressing her dissatisfaction with her own RRC placement, she provides no credible basis for this Court to issue a writ of mandamus. *See Stanley v. Whitehead*, No. 09-2104, 2010 WL 2011553, at *2 (D.Md. Apr. 21, 2010) (Denying request for mandamus relief directing BOP to amend regulations.) To be sure, the Second Chance Act is clear that inmates only have a right to be considered for twelve month pre-release placement. *See* 18 U.S.C. § 3624(c). The BOP's internal agency guidance and the 2008 Interim Rule, guide staff through the proper process for considering inmates for RRC placements under the Second Chance Act. Petitioner was considered for placement. Therefore, Petitioner has no right to relief, and her claim fails under the first factor.

Petitioner's claim also fails to satisfy the the second factor. While the Second Chance Act directed the BOP to issue regulations, the BOP has no obligation to fashion a regulation to Petitioner's particular taste and liking. Indeed, Congress left it to the BOP to formulate the appropriate regulations and guidance to implement the Second Chance Act. The BOP's regulation and agency guidance are entitled to deference. *See Barnhart*, 535 U.S. at 221-222.

To the extent Petitioner's claim could also be construed as alleging *unreasonable delay,* the claim fails. The party requesting the drastic remedy of mandamus must show that "the agency's delay is [ ]egregious." *Telecommunications Research and Action Center v. Federal Communication Commission*, 750 F.2d 70, 79 (D.C. Cir. 1984).[9]

---

[9]      In *Telecommunications Research and Action Center,* (also know as "TRAC"), the District of Columbia Circuit created a six-factor test for courts to consider in determining whether a federal agency's failure to act is unreasonable under the APA: (1) the time agencies take to make

"There is no per se rule as to whether a given delay is reasonable, and [] courts must determine the reasonableness of delay based on the totality of the circumstances." *Families for Freedom v. Napolitano*, 628 F.Supp.2d 535, 540 -541 (S.D.N.Y. 2009). Among other factors, courts evaluate "the pace of the agency decisional process.

In deciding whether the a decision is unreasonably delayed, the court should consider the nature and extent of the interests prejudiced by the delay, the agency justification for the pace of decision, and the context of the statutory scheme out of which the dispute arises." *Public Citizen Health Research Group v. Commissioner, Food and Drug Administration*, 740 F.2d 21, 35 (D.C. Cir. 1984). Lengthy delays are less tolerable where health, welfare, and the necessities of life are at stake. *See Blankenship v. Secretary of Health, Education and Welfare*, 587 F.2d 329, 334 (6th Cir. 1978)(Unreasonable delay where "applicants [were] destitute and seek benefits for the necessities of life.)

Here, the Second Chance Act, enacted on April 9, 2008, required the BOP to issue regulations "not later than 90 days after the date of enactment." Five days later, on April 14, 2008, the BOP issued guidance that directly addressed the new contours of the law

---

decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed. 750 F.2d at 80; *Families for Freedom v. Napolitano*, 628 F.Supp.2d 535, 540 -541 (S.D.N.Y. 2009) (analyzing claim using six-part test).

and required that all inmates be individually considered for pre-release RRC placements for a maximum of twelve months, using the five-factor criteria enumerated in § 3621(b), to ensure the greatest likelihood of successful reintegration into the community. On October 21, 2008, the BOP promulgated the 2008 Interim Rule to implement the Second Chance Act. 73 FR 62440. The language of 28 C.F.R. Section 570.22 encompasses the desired results of the Act.

The BOP did not cause any unreasonable delay in implementing the Second Chance Act, and has ensured that inmates receive the benefits of the Second Chance Act. Indeed, within days of the enactment of the Second Chance Act, the BOP issued its first set of guidelines for making RRC referrals. This memorandum served as temporary guidance to staff. *See McElhaney v. Mukasey,* No. 4:08-cv-537, 2008 WL 4694971, at *2 (Oct. 23, 2008, N.D.TX). Within approximately 6 months, the BOP published its interim final regulations in the Federal Register. Therefore, there is no evidence of unreasonable delay in the implementation of the Second Chance Act. The BOP has not only issued interim regulations, but also guidance to direct pre-release placement. In sum, there is no basis for a writ of mandamus because, Petitioner has failed to establish undue delay, or a right to the relief sought. Petitioner's complaint must be dismissed.

## II.   THE BOP'S APRIL AND NOVEMBER MEMORANDA COMPLY WITH THE MANDATE OF THE SECOND CHANCE ACT

Petitioner argues that two of the BOP's internal memoranda, referencing the Second Chance Act dated April 14, 2008 ("April Memo") and November 14, 2008 ("November Memo"), violate the Second Chance Act because the memoranda limit all RRC placements to six months,

26

instead of twelve months.[10]   Specifically, Petitioner contends that the Second Chance Act requires that all inmates receive twelve month placements in RRCs.  Petitioner also argues that the April and November Memoranda violate the APA, because they were issued without notice and comment. These claims are without merit because the April and November Memoranda are exempt from the notice and comment requirements, and the BOP's internal memoranda and policy statements comply with the requirements of the Second Chance Act.

### A.   BOP's Internal Agency Memoranda Are Not Subject To The APA

Petitioner argues that the April and November Memoranda are "substantive rules" subject to the procedural requirements of the APA.  They are not.  Both Memoranda are internal statements of agency policy to which the APA's procedural requirements do not apply.  5 U.S.C. § 553(b)(3)(A).  Specifically, the BOP's April and November Memoranda are akin to interpretive rules that do not require notice and comment.  *Reno v. Koray*, 515 U.S. 50, 61(1995).

While the case law does not clearly delineate between these types of rules, it is recognized that internal guidance on discretionary functions falls beyond the APA's purview.  The Seventh Circuit examined the difference between substantive rules and internal agency guidance in the prison context in *Miller v. Henman,* 804 F.2d 421, 424-428 (7th Cir. 1986).  The question raised was whether Program Statements and other internal guidance documents that instructed the BOP staff on how to exercise the

---

[10]      Unlike the policies and regulations guiding the BOP's end-of-term placements under § 3624(c), the November 14 memo guides the BOP's consideration of mid-term halfway house placements.

Attorney General's discretionary authority to place inmates in penitentiaries and to transfer inmates under 18 U.S.C. § 4082-83, created substantive rules and enforceable rights. The court held that they did not. The court reasoned that the Attorney General has the option to promulgate regulations that create substantive, enforceable rules directing how he will carry out a discretionary task delegated to him by Congress. To do so, he must comply with the rule-making procedures of the APA and once the rules are passed, they create rights on behalf of the inmates regulated which are enforceable against him. *Miller*, 804 F.2d at 424.

"But if all the Attorney General has done is to tell his staff how he wants to exercise his discretion – language that brings his subordinates' acts in line with his wishes but does not reduce his discretion to do otherwise – then there is no substantive rule enforceable in any forum." *Id.* "Whether we call the pronouncements 'internal personnel manuals' or 'precatory' or something else, they remain statements of the way in which discretion is exercised but do not establish substantive rights." *Id.*

Here, the challenged policy is precisely the type of discretionary guidance discussed in *Miller*. The April and November Memoranda merely advised the agency staff of how the director wishes to exercise her discretion. It was the Second Chance Act, not the April Memo, November Memo, or the 2008 Interim Rule, that created substantive rules and enforceable rights. Thus, because neither of the Memoranda are substantive, they are not subject to any of the procedural requirements of the APA, including the

requirements of § 706. Therefore, Petitioner's claim that the April and November Memoranda are invalid, lacks merit, and must be dismissed.

### B.    The April and November Memoranda Comply With The Act

Both the April and November Memoranda clearly instruct staff that all inmates are eligible for up to 12 months of RRC placement and that each inmate's transition needs must be assessed individually with consideration of the five § 3621(b) factors. The guidance further directs staff consideration, highlighting that placement decisions should consider an inmate's needs – i.e. for employment, medical and psychological services, community ties – with the programs and services provided by halfway house facilities. *See* April Memo at 2; November Memo at 2.

Petitioner challenges two phrases in the April and November Memoranda. First, she challenges the BOP's statement, which provides that "Bureau experience reflects inmates' prerelease RRC needs can usually be accommodated by a placement of six months or less," and requires the approval of the Regional Director before a pre-release placement of more than six months is granted. *See* April Memo at 4; November Memo at 3. Petitioner also takes issue with the required showing of an "extraordinary justification" and "highly unusual" or "unusual and extraordinary circumstances" before a placement of more than six months is granted.[11] *See* April Memo at 4; November Memo

---

[11]     Petitioner's claim that the BOP has adopted by reference the definition for "unusual or extraordinary circumstances" from the Sentencing Reform Act, 18 U.S.C. § 3582(c)(1)(A), lacks factual support. There is no evidence in the record (i.e. the April Memo, November Memo or Program Statements) that the BOP has adopted this definition. The BOP has never directed its staff to apply the definition in § 3582 to determine RRC placement.

at 3. Petitioner, however, ignores the sentences that follow these statements, which instruct staff on the procedure to follow when an individual inmate is determined to need more transition time. *See* April Memo at 4, November Memo at 3. A fair reading of the entire April and November Memoranda, reveals that both the April and November Memoranda are consistent with, not contrary to, the provisions of the Second Chance Act.

As such, the April and November Memoranda are entitled to respect. *U.S. v. Mead,* 533 U.S. 218, 227-30 (2001). To be sure, the Supreme Court has explained that *Chevron* deference should be accorded to an agency's interpretation, even if the agency has not reached its conclusion through notice and comment rulemaking or formal adjudication. *See Barnhart,* 535 U.S. at 221-22; *Mead,* 533 U.S. at 230-31.[12] Whereas here, there is evidence that Congress meant to delegate to the agency the authority to make determinations having the force of law, *Chevron* deference may be appropriate. In *Barnhart,* for example, the Court noted that "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, and the careful consideration the Agency has given the question over a long

---

[12]    Even if not afforded *Chevron* deference, at a minimum, the April and November Memoranda are entitled to *Skidmore* deference. *Mead,* 533 U.S. at 228. Internal agency guidelines are afforded *Skidmore* deference to the extent they have the power to persuade – meaning its thoroughness is evident in its consideration, its reasoning is valid, it is consistent with earlier and later pronouncements. *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944). The April and November Memoranda would be entitled to *Skidmore* deference because they direct the agency's exercise of its placement authority within the limitations created by Congress. The April and November Memoranda are consistent with the Second Chance Act, in that they require individualized assessments based on the five enumerated statutory factors. *McGee v. Thomas,* 2009 WL 2182385, at *16-19 (D.Or. July 22, 2009)(Giving *Skidmore* deference to challenge of April 14 Memo and Program Statement).

period of time" indicated that "*Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." *Id.* at 222.[13]

The enumerated list of factors are non-exhaustive, and the BOP may consider others. *Levine v. Apker*, 455 F.3d 71, 86 (2d Cir. 2006). As one Second Circuit district court held, the BOP's "extraordinary justification standard is an appropriate exercise of its discretion under Section 3621(b). . . The BOP's policy still requires the BOP to consider all of the factors set forth in Section 3621(b)." *Synder v. Angelini*, No. 07cv3073, 2008 WL 4773142, at *3 (E.D.N.Y. Oct. 27, 2008). The court noted that "section 3624 continues to leave to the BOP's discretion the precise amount of time of transactional custody provided to inmates before release, this statutory change in no way undermines the BOP's determination that a transfer to community confinement for a

---

[13]    Petitioner's reliance on the analysis in *Crickton v. Thomas,* 579 F.3d 978,988 (9thCir. 2009) *and Mendis v. Filip,* 554 F.3d 335, 338 (2d Cir.2009) is misplaced. First, Petitioner misconstrues the holding in *Mendis.* The *Mendis* court was deferential to the Board of Immigration Appeal's (BIA) interpretation of immigration statutes, giving it *Chevron* deference. The court held, however, that the *non-precedential unpublished* decision of the BIA, was not entitled to *Chevron* deference, noting that *Chevron* deference is not warranted where "the challenged BIA decision is unpublished" and therefore not intended to carry the force of law. *Id.* The court then went on to say: "We have not yet resolved whether IJ opinions or unpublished BIA opinions interpreting immigration statutes are entitled to *Skidmore* deference, or whether they are reviewed de novo." *Id.* at n. 3.

The problem with Petitioner's reliance on *Crickton* is two-fold. First, *Crickton* was based on the Ninth Circuit's ruling in *Arrington v. Daniels,* 516 F.3d 1106, 1113 (9th Cir.2008). No circuit outside the Ninth Circuit has adopted the analysis in *Arrington,* and most courts to consider it have criticized and rejected it. *See Abies v. Eichenlaub No.5:08cv204,* 2009 WL 722287, at *7 (N.D.Fla. Mar. 18, 2009) (collecting cases). Second, *Crickton* concerned the BOP's decision to create categorical exclusions--a substantive rule. The Ninth Circuit invalidated the categorical rule codified in the BOP's program statements because it held the BOP failed to articulate a rationale for its categorical exclusions. The Memoranda at issue in this case do not contain any categorical exclusions, and are interpretive, internal agency guidelines.

period greater than six months will only be granted upon a showing of extraordinary justification." *Id; Pierre v. Zickefoose et al.*, No. 3:09cv109, 2010 WL 625419, at 2 (D.Conn. Feb. 10, 2010)(*citing Miller v. Whitehead*, 527 F.3d 752, 757-58 (8th Cir. 2008)("The Second Act does not require the BOP to grant an inmate's request for RRC placement for the full twelve months, but rather to consider an inmate's request in accordance with the Act . . . Confinement in an RRC for more than 180 days is 'highly unusual' and only possible with extraordinary justification."); *see also Daraio v. Lappin*, No.08-CV-1812, 2009 WL 3030995, at * 6 (D.Conn. Feb.9, 2009), *adhered to on recon.*, 2009 WL 712362 (Mar. 13, 2009)(the BOP "retains discretion under the Second Chance Act to decide whether and when an inmate should be placed at an RRC, provided such pre-release confinement is practicable and the BOP considers the statutory factors.")

Petitioner also argues that the requirement of the regional director's approval is evidence that the BOP merely pays "lip service" to the Second Chance Act – in other words, that the BOP's practice is to grant *no more* than six months. This claim lacks merit.[14] The majority of courts that have entertained this challenge to the April and November Memoranda, have rejected Petitioner's argument. "The majority view,

---

[14]    Petitioner makes a tangential reference to *Levine v. Apker*, 455 F.3d at 85-86. But, neither the April nor November Memoranda create a "categorical rule" such as that addressed in *Levine*. At issue in *Levine* was the BOP regulations that prohibited inmates from being placed in a halfway house at any time before the final ten percent of their prison term. 28 C.F.R. §§ 570.20-.21 (2005). The *Levine* court held that the BOP could not apply a rule that eliminated the opportunity for individualized consideration of each inmate's placement needs where the statute –18 U.S.C. § 3621(b)– required individualized consideration. Because both the April and November Memoranda not only permit, but require, individualized placement assessments, there is no categorical rule, and *Levine* is inapplicable.

reflected in numerous trial and appellate court decisions, holds that the Bureau of Prisons requirement of regional director approval, and the agency's stated view that many inmates can have their needs [met] through 180-day RRC placements, do not violate the [Second Chance Act]." *McDonald v. Obama*, No. 1:10cv379, 2010 WL 1526443, at *6 (M.D.Pa.Mar.15, 2010)(collection of cases).[15] The majority view correctly points out that the BOP's policies "reflect the [BOP's] exercise of its discretion in implementing the [Second Chance Act] which simply provides that prison officials 'may' use community correction facilities for up to 12 months to aid inmates in their return to society." *Id.* at 7. The statute's plain terms provide that the duty to make RRC placements is limited "to the extent practicable."[16] *See Id.*; *Mora-Meraz v. Thomas*, 601 F.3d 933, 940-943 (9th Cir. 2010) ("The Bureau is properly concerned with enrolling inmates who genuinely qualify for therapy" and prisoners "should not be permitted to take the place of another who is in greater need of this intensive treatment."); *Elwood v. Jeter*, 386 F.3d 842, 847 (8th Cir. 2004)(The BOP's obligation to facilitate inmate's reentry is limited by practical

---

[15]     Petitioner does not argue that the BOP has failed to grant any inmate more than six months pre-release placement to a RRCs, but that the BOP should be granting longer placements to more inmates. *See* Petition Brf. p. 18-20. Petitioner has brought her complaint to the wrong forum. This is an issue better suited for the Congressional Oversight Committee. *Turner v. Safley*, 482 U.S. 78, 84-85 (1987); *DeLa Cruz v. Bledsoe*, No. 1:10cv139, 2010 WL 1791241, *11 (M.D.Pa. Mar. 3, 2010).

[16]     Numerous courts have declined to follow the two district court cases cited by Petitioner in support of her argument -- *Krueger v. Martinez*, 665 F. Supp.2d. 477 (M.D.Pa, 2009) and *Strong v. Schultz*, 599 F.Supp.2d 556 (D.N.J. 2009)-- noting that the Second Chance Act, does not have the force Petitioner suggests. *See Fournier v. Zickefoose*, 620 F.Supp.2d 313, 318 (D.Conn. 2009)("[T]he BOP has discretionary authority both in determining the individual's placement and in directing the transfer of the prisoner from one penal or correctional facility to another."); *see also McDonald, supra*; *DeLa Cruz, supra*.

concerns, such as security or space limitations.)  The statute only requires that the BOP consider inmates individually, based on the factors in § 3621, for twelve month RRC placement.  *Id.*  Accordingly, the April and November Memoranda comply with The Second Chance Act, and Petitioner's claim must be dismissed.

## III.   DISTRICT COURTS LACK THE AUTHORITY TO REVIEW THE BOP'S EXERCISE OF ITS DISCRETIONARY RRC PLACEMENT DECISIONS

Petitioner's present challenge is predicated on a fatal misinterpretation of the Second Chance Act.  Petitioner reads the Second Chance Act to create a mandatory, and enforceable presumption in favor of twelve months RRC placement for all inmates.  As discussed above, the plain language of the Second Chance Act does not support this contention.  *Hibbs v. Winn*, 542 U.S. 88, 89-101 (2004) (The rule against superfluities, requires that a statute be construed to give effect to all its provisions, so that no part is inoperative or duplicative, void or insignificant.); *Duncan v. Walker*, 533 U.S. 167, 174 (2001)("We have a duty, where possible to give effect to all operative portions of the enacted language, including its every clause and word")(internal quotations omitted.)

Petitioner's request requires this Court to overlook the express delegation of authority Congress gave to the BOP.  *See Lopez v. Davis*, 531 U.S. 230, 240-241 (2001) (Noting that the word "may" is to be read as a grant of discretion and "shall" as a command).  As stated previously, section 3624(c) provides the Bureau with the "sole and exclusive" discretion to make RRC placements.  *See* H. Rep. 110-140, *20, supra*.  Thus, Petitioner's challenge to her RRC placement is beyond this Court's jurisdiction.  As long as the BOP considers an inmate for a twelve month placement, utilizing the factors

enumerated by Congress, it has the sole discretion to decide whether and where to place an inmate in a RRC.

Here, Petitioner challenges the Bureau's final decision to grant her an 177 day placement, instead of the maximum possible placement of twelve (12) months. Considering all of the factors enumerated in § 3624 (c), BOP determined that a placement of 120 to 150 day (four to five months) would be of sufficient duration to provide Petitioner the greatest likelihood of successful reintegration into the community. *See* Tolworthy Decl. at ¶ 6. There is no evidence that the BOP failed to consider Petitioner for a twelve month RRC placement, utilizing all five factors, and in accord with the Second Chance Act, when it determined that a 177 month placement would be sufficient. *See* Tolworthy Decl., Ex. 1, at ¶ 6; *see also Miller v. Whitehead*, 527 F.3d 752, 758 (2008).

Petitioner's challenge to the BOP's decision, amounts to nothing more than an invitation for this court to second guess the BOP's discretionary decision to grant her a six month RRC placement, instead of twelve months. But, the Second Chance Act only affords an inmate a right to consideration for RRC placement, which the BOP has provided. To be sure, Congress has made clear its intent that the BOP should be afforded unfettered discretion to make individual placement decisions and that courts should not review such decisions.[17] Accordingly, Petitioner's invitation, for this Court to second

---

[17]     The Senate report provides: "This provision makes clear that certain of the provisions of the Administrative Procedure Act do not apply to any determination, decision, or order of the Bureau of Prisons. . . . [It] will assure that the Bureau of prisons is able to make decisions concerning

guess the decision of the BOP, must be declined.  To do otherwise would run counter to Congressional intent, as it would constitute the very "second guessing" that Congress has expressly prohibited. *See* H. Rep. 110-140, *20, *supra* (stating Congress' intent that BOP have the "sole and exclusive" discretion to make such placements).

Furthermore, pursuant 18 U.S.C. § 3625, district courts do not have jurisdiction to review the merits of the Bureau's discretionary decisions.  Indeed, while final agency decisions, are normally reviewable for abuse of discretion, under the §§ 701-706 of the APA, individual placement decisions are precluded from APA review pursuant to § 3625. *Pierre v. Zickefoose et al.*, No. 3:09cv109, 2010 WL 625419, at * (D.Conn Feb. 10, 2010); *Fournier*, 620 F.Supp.2d at 318; *Daraio v. Lappin*, No. 08-CV-1812, 2009 WL 303995, at *6 (D.Conn. Feb.9, 2009), *adhered to on recon.*, 2009 WL 712362 (Mar. 13, 2009).

While a district court may review an inmate's claim that the Bureau has violated the Constitution or exceeded its statutory authority, as well as review the Bureau's interpretation of a statute that is contrary to settled law, the substantive decision of the BOP to grant or deny placement in a RRC is precluded from judicial review by statute. *See, e.g., Putnam v. Winn*, 441 F.Supp.2d 253 255-56 ("[T]here is no habeas review of discretionary routine placement decisions ..."); *Fox v. Lappin*, 409 F.Supp.2d 79, 89

---

the appropriate facility, corrections program, and disciplinary measures for a particular prisoner without constant second guessing. The provision, of course, would not eliminate, and is not intended to eliminate, constitutional challenges." Senate Report 98-225, P.L. 98-473, Comprehensive Crime Control Act of 1984, 1984 U.S.C.C.A.N. 3182, 3332, 1983 WL 25404, *149 (August 4, 1983) (emphasis added).

(D.Mass.2006) ("The Court ... can only review the Bureau's policies regarding the placement of inmates ... not the decision itself."); *see also*, H. Rep. 110-140, *20, *supra*; and *Falcon v. Knowles*, 807 F.Supp. 1531, 1533 (S.D.Fla.1992) ("[A]ny approach that puts the judicial branch in charge of designating the place of confinement for a federal prisoner--no matter how well justified on utilitarian grounds-- collides with . . . [the BOP's] unfettered authority to decide where to house federal prisoners"). Thus, this court lacks the jurisdiction to review the discretionary decision of the BOP to grant Petitioner a 177 day placement in a RRC. As Petitioner's claim is beyond the jurisdiction of this court, her request for habeas relief must be denied.

## CONCLUSION

For the foregoing reasons, this court must dismiss Petitioner's application for writ of habeas corpus.

37

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

NDIDI N. MOSES
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27456
UNITED STATES ATTORNEY'S OFFICE
157 CHURCH STREET
NEW HAVEN, CT 06510
(203) 821-3700 (telephone)
(203) 773-5373 (facsimile)
Ndidi.Moses@usdoj.gov

On the Memorandum:
Laura Vitale, 2012
University of Connecticut School of Law

38

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was mailed, postage prepaid, June 30, 2010, to:

Brett Dignam, Esq.
Counsel for Petitioner
Jermone N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090

NDIDI N. MOSES
ASSISTANT U.S. ATTORNEY